Annazell **LEMASTER**, Individually and as Independent Executrix of the Estate of Ronald Lewis Lemaster, Appellant

v.

**TOP LEVEL PRINTING INK, INC.,** Douglas Raley, and Billy Ragland, Appellees.

No. 05–03–00903–CV.

Court of Appeals of Texas, Dallas.

June 15, 2004.

James A. Fisher, T. Wesley Holmes, Fisher Holmes & Turner, Dallas, for Appellant.

Jeffrey L. Clark, Kelsoe, Anderson, Khoury & Clark, Dallas, for Appellee.

Before Justices MOSELEY, O'NEILL, and RICHTER.

## OPINION

Opinion by Justice O'NEILL.

Appellant Annazell Lemaster, individually, and as independent executrix of the estate of Ronald Lewis Lemaster, appeals a judgment granted in favor of appellees Top Level Printing Ink, Inc., Douglas Raley and Billy Ragland. In two issues, Annazell contends the trial court erred in (1) granting a partial summary judgment declaring an oral stock purchase agreement valid, and (2) directing a verdict that the oral agreement and a written stock purchase agreement were enforceable against her. For the following reasons, we affirm the trial court's judgment.

In 1997, Annazell's husband, Ronald Lemaster, and appellees Douglas Raley and Billy Ragland formed appellee Top Level Printing. In 2001, Ronald died. Appellees Raley, Ragland, and Top Level Printing subsequently sued Ronald's wife, Anazelle, seeking to enforce a stock purchase agreement they had allegedly entered into with Ronald. They relied on a 1997 oral agreement and a 2001 written agreement setting forth the same terms. Pursuant to the alleged agreements, if any of the three stockholders died or became disabled, the corporation would purchase that stockholders' shares at book value. Appellees filed a motion for summary judgment asserting the oral and/or written stock purchase agreements required Annazell to convey Ronald's stock to Top Level Printing at book value.

The trial court granted appellees' motion in part concluding the 1997 oral stock purchase agreement between Top Level Printing and the three named stockholders was valid. However, the trial court refused to grant summary judgment that the agreement was valid to the extent it concerned Annazell's community property interest in the stock. The trial court also denied the motion with respect to the 2001 written agreement. The trial court proceeded with a jury trial on the remaining issues.

At trial, Billy Ragland testified that when he, Ronald, and Doug Raley formed Top Level Printing, each stockholder paid $5,000 for his 5,000 shares. Ronald paid for his shares with a check drawn off a bank account held in his name alone and Ronald's stock was issued to him in his name alone. Shortly thereafter, the stockholders orally agreed that if any of them died or became disabled, the company would buy that stockholder's share at book value.

Over the following few years, the stockholders discussed putting the oral stock purchase agreement in writing. They finally did so in February 2001. Each of the stockholders signed the agreement.

Under the signatures of the stock holders, the agreement contained a separate place for each of the wives to indicate they agreed to the contract. Ragland testified his wife and Raley's wife each signed. After Ronald's death, Ragland learned that Annazell had not signed the agreement.

Ragland conceded he was aware Ronald's stock was community property, but he also understood that Ronald had "control" over the stock. Prior to Ronald's death, Annazell never told Ragland that she opposed the stock purchase agreement or that Ronald did not have the authority to deal with the stock. According to Ragland, the agreement had spaces for the wives' signatures so there could be no dispute that the wives knew about the agreement.

Doug Raley also testified that the stockholders orally agreed to the terms of the stock purchase agreement in 1997. In February 2001, the written agreement was prepared and all three stockholders signed. After the stockholders signed the agreement, Raley's wife and Ragland's wife each signed. Raley did not learn that Annazell had not signed the agreement until after Ronald's death. According to Raley, neither Ronald nor Annazell ever communicated to him that Ronald lacked authority to deal with the stock. Raley testified the reason they wanted the wives to sign the agreement was to avoid the litigation they were currently in.

■ After appellees rested, Annazell rested and closed without presenting any evidence. Following the close of evidence, the trial court granted appellees' motion for a directed verdict that the 2001 written stock purchase agreement was valid and enforceable against Annazell. In her second point of error, Annazell contends the trial court erred in granting the directed verdict. When we review the grant of a directed verdict, we determine whether any probative evidence exists "to raise a fact question on the material questions presented." *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978); *Sibai v. Wal-Mart Stores, Inc.*, 986 S.W.2d 702, 705 (Tex.App.-Dallas 1999, no pet.). We consider all the evidence in the light most favorable to the party against whom the trial court directed a verdict and disregard all contrary evidence and inferences. *Collora*, 574 S.W.2d at 68; *Sibai*, 986 S.W.2d at 705. A directed verdict is proper for a plaintiff if the evidence conclusively proves facts that establish the plaintiff's right to recovery. *See Sibai*, 986 S.W.2d at 705; *Edlund v. Bounds*, 842 S.W.2d 719, 723–24 (Tex.App.-Dallas 1992, writ denied).

The trial court granted the directed verdict because appellees conclusively established Ronald entered into a valid written stock purchase agreement and he had the authority to do so because the stock was his sole management community property. In this point, Annazell first asserts appellees failed to conclusively establish the stock was Ronald's sole management community property because the only evidence admitted came from interested witnesses or from documents authenticated by interested witnesses.

■ Property is presumed to be subject to the sole management, control, and disposition of a spouse if it is held in that spouse's name, as shown by a muniment, contract, deposit of funds, or other evidence of ownership, or if it is in that spouses possession and is not subject to such evidence of ownership. TEX. FAM. CODE ANN. § 3.104(a) (Vernon 1998). A third person dealing with a spouse is entitled to rely, as against the other spouse or anyone claiming from that spouse, on that spouse's authority to deal with the property if: (1) the property is presumed to be subject to the sole management, control, and disposition of the spouse; and (2) the

person dealing with the spouse (A) is not a party to fraud on the other spouse; and (B) does not have actual or constructive notice of the spouse's lack of authority. *See* TEX. FAM.CODE ANN. § 3.104 (Vernon 1998).

■ To show the stock was subject to Ronald's sole management and control, appellees presented evidence that the stock was not only issued in Ronald's name alone, but was also paid for with a check from a bank account in Ronald's name alone. The stock and the check Ronald used to purchase the stock were both offered into evidence. At trial, Annazell did not question the authenticity of these documents. Instead, she now asserts for the first time that this documentary evidence is subject to the interested witness rule because it was authenticated by the testimony of interested witnesses. Annazell cites no authority to support the assertion that documentary evidence authenticated by an interested witnesses renders the documentary evidence subject to the interested witness rule. Furthermore, the testimony of an interested witness may establish a fact as a matter of law if (1) the testimony could have been readily contradicted if untrue; (2) it is clear, direct, and positive, and (3) there are no circumstances tending to discredit or impeach it. *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex.1989); *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 91 (Tex.App.-Dallas 1996, writ denied). Here, Annazell could have presented evidence that the documents, one from her husband's bank, the other bearing her husband's signature, were not genuine. She did not do so. Further, the interested witnesses testimony concerning authentication was clear, direct, and positive and there were no circumstances tending to discredit it. We conclude appellees conclusively established (1) the stock was pur-chased with funds held in Ronald's name alone, and (2) the stock was held in Ronald's name alone. Consequently, appellees were entitled to rely on Ronald's authority to deal with the property absent evidence of fraud or actual or constructive notice that he lacked authority.

Annazell asserts a fact issue exists concerning whether appellees had notice that Ronald lacked authority to deal with the stock. She relies on the stock purchase agreement itself. Specifically, she contends appellees had notice of Ronald's lack of authority because the stockholders sought to acquire the signatures of their wives. We cannot agree that this constitutes evidence the stockholders had notice that the stock was not under the sole management and control of the respective stockholders. Rather, that evidence shows only that the parties hoped to avoid the instant litigation. Annazell also asserts there was evidence appellees had notice of Ronald's lack of authority because after his death, appellees sent her a letter indicating the stock purchase agreement was effective only against Ronald's community interest in the shares. We conclude this letter, at most, shows appellees' misunderstanding of community property law and did not raise a fact issue regarding whether they had prior notice that Ronald was not authorized to deal with the stock he held in his name alone.

We further conclude the stock purchase agreement was not invalid because it was never signed by Annazell. As noted above, because the stock was Ronald's sole management community property, Annazell was not required to sign the agreement to make it valid. We also reject Annazell's assertion that the parties did not intend the agreement to be effective unless the wives signed it. Rather, the agreement itself shows the wives were not signing the agreement as parties to it.

Rather, their signature lines were in a separate portion of the agreement from the stockholders and the corporation. The agreement itself also shows the parties intended it to be effective irrespective of the wives signatures because it states it was merely a memorialization of an earlier oral agreement between the stockholders.

We conclude appellees conclusively established that the stock was Ronald's sole management community property and that Ronald executed a valid written stock purchase agreement. Therefore, the trial court did not err in granting appellees' motion for directed verdict. Because we conclude the trial court properly granted the directed verdict with respect to the 2001 written agreement, and that agreement supports the trial court's judgment, we need not decide whether the trial court properly granted the partial summary judgment or directed verdict on the oral agreement.

We affirm the trial court's judgment.