## In the ESTATE OF Arthur Eugene LONGRON, Jr., Deceased.

### No. 09–05–463 CV.

Court of Appeals of Texas, Beaumont.

Dec. 7, 2006.

Larry C. Hunter, Hunter Burch, LLP, Vidor, for appellant.

John Cash Smith, Bush Lewis, PLLC, Orange, for appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

HOLLIS HORTON, Justice.

This appeal involves a jury's rejection of an attempt to probate a copy of a destroyed will. We must decide if the trial court erred when it granted the will's putative executor a judgment notwithstanding the verdict that awarded him his attorney's fees and expenses. We affirm the trial court's judgment in part, reverse in part, and render judgment on the jury's verdict.

### Procedural Background

Arthur Eugene Longron, III ("Artie") filed an application for independent administration of the estate of his deceased father, Arthur Eugene Longron, Jr. ("Frenchie"). Artie alleged that Frenchie died intestate. After the trial court appointed Artie as independent administrator, Don Rice filed an "Application for Probate of a Written Will Not Produced in Court." Rice alleged that Frenchie left a valid, unrevoked, written will dated December 11, 2002 ("Will") that was destroyed illegally. The Will named Rice as independent executor.

After a four-day trial, the jury made two findings. First, the jury found that Frenchie revoked his Will. Second, the jury found Don Rice did not act in good faith and with just cause when he prosecuted his application to probate the Will. Based on the jury's revocation finding, the trial court denied Rice's application to probate the Will. However, the trial court granted Rice's motion for judgment notwithstanding the verdict on the jury's second finding-that Rice did not act in good faith and with just cause. The court also awarded Rice attorney's fees and expenses in the amount of $45,000. Rice did not ask the trial court to overturn the jury's finding on revocation; thus, that part of the trial

court's judgment is not included in our review.

In his sole issue on appeal, Artie contends the trial court erred when it granted Rice attorney's fees and expenses payable out of the funds of the decedent's estate, notwithstanding the jury's verdict that Rice did not act in good faith and with just cause. We agree.

### Factual Background

Frenchie Longron died on November 14, 2003, and left a substantial estate. While he was not married at the time of his death, he had one living child—Artie. Frenchie led a colorful life. One of Frenchie's friends thought Frenchie "should have been born back in the wild, wild West." Some of Frenchie's friends considered him to be a flamboyant, larger-than-life "character" who indulged in activities that ranged from burying coins on his property to raising exotic animals. On occasion, Frenchie was generous to his friends. Although some might conclude that he was eccentric, Frenchie was a successful businessman who liked to "make deals." Unfortunately, he was also in failing health.

Ultimately, Frenchie had a stroke in February 2002. Frenchie's poor health, his failure to execute a new will, and questions about whether he destroyed his prior will prompted the events that led to the probate dispute between his son, Artie, and his friend, Don Rice.

- In May 2002, Artie filed an application to be appointed Frenchie's guardian.
- In October 2002, Frenchie filed suit against Artie for breach of contract and conversion but never served him.
- In December 2002, Frenchie signed the Will that gave Artie one dollar and devised the rest of his estate to various relatives and friends. Frenchie's Will named Don Rice as independent

executor and trustee for various trusts.

- In January 2003, Artie dismissed his guardianship application.
- In October 2003, Frenchie consulted with his attorney, Steve Parkhurst, about drafting a new will that would leave most of Frenchie's estate to Artie. According to Parkhurst, Frenchie and Artie were on good terms again. Parkhurst testified he told Frenchie that Artie would get only a dollar if Frenchie died before completing the new will. When Frenchie asked how to get rid of the Will, Parkhurst advised him to either finish the new will or tear up the old will.

On November 17, 2003, three days after Frenchie died, Artie applied for an independent administration of Frenchie's estate. The application, filed by Parkhurst on Artie's behalf, alleged that Frenchie died without a will. The trial court granted Artie's application on December 5, 2003.

Several weeks after the funeral, Macel Stout, a long-time employee of Frenchie's, told Artie that she saw Frenchie destroy the Will shortly before he died. On May 7, 2004, Rice applied to probate the Will.

Artie contends that the trial court erred when it set aside the jury's finding on "good faith" and "with just cause" and when it entered a judgment notwithstanding the verdict ("JNOV"), which awarded Rice his attorney's fees and expenses. In his motion for JNOV, Rice maintained there was "no evidence" to support the jury's finding in Question No. 2. That question asked the jury as follows: "Do you find from a preponderance of the evidence that Don Rice has acted in good faith and with just cause in the prosecution of his Application for Probate of the Will dated December 11, 2002?" The jury answered "No."

## Applicable Statute

To recover attorney's fees under section 243 of the Texas Probate Code, Rice bore the burden of proving that he brought the suit in good faith and with just cause. In pertinent part, section 243, entitled "Allowance for Defending Will," provides for an allowance out of estate assets in certain circumstances:

> When any person designated as executor in a will or an alleged will, or as administrator with the will or alleged will annexed, defends it or prosecutes any proceeding in good faith, and with just cause, for the purpose of having the will or alleged will admitted to probate, whether successful or not, he shall be allowed out of the estate his necessary expenses and disbursements, including reasonable attorney's fees, in such proceedings.

Tex. Prob.Code Ann. § 243 (Vernon 2003).

Little case law exists interpreting section 243 under the circumstances found in this case. Neither party has cited, nor has our research revealed, any cases upholding a trial court's entry of JNOV after a jury answered section–243 issues on "in good faith" and "with just cause." However, our research finds several cases that uphold the jury's verdict. *See Garton v. Rockett,* 190 S.W.3d 139, 149 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (holding that because more than a scintilla of evidence supported jury's finding that party acted in good faith and with just cause, trial court erred in granting JNOV); *Ray v. McFarland,* 97 S.W.3d 728, 730 (Tex. App.-Fort Worth 2003, no pet.) (finding that because some evidence supported the jury's finding that party did not act in good faith and with just cause, the trial court erred in entering JNOV); *Zapalac v. Cain,* 39 S.W.3d 414, 419–21 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (finding

that trial court did not err in refusing to disregard the jury's finding that party acted in good faith and with just cause since there was more than a scintilla of evidence to support the jury's finding).

### Standard of Review

A JNOV is proper only if a directed verdict would have been proper. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991). The standard of review for a JNOV is the same as that for a directed verdict. *Rush v. Barrios*, 56 S.W.3d 88, 94 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). However, a directed verdict is proper only if the evidence conclusively establishes the movant's right to judgment, negates the opponent's right to judgment, or is insufficient to raise a fact issue on a vital fact. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex.2000); *Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 768 (Tex.App.-Fort Worth 1994, writ denied). The trial court may direct a verdict for the party with the burden of proof "when reasonable minds can draw only one conclusion from the evidence." *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978) ("When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury."); *Lemaster v. Top Level Printing Ink, Inc.*, 136 S.W.3d 745, 747 (Tex.App.-Dallas 2004, no pet.) ("A directed verdict is proper for a plaintiff if the evidence conclusively proves facts that establish the plaintiff's right to recovery.").

Thus, we affirm a JNOV if the evidence establishes an issue as a matter of law or conversely, there is no evidence to support an issue. *Rush*, 56 S.W.3d at 94 (citing *Exxon Corp. v. Quinn*, 726 S.W.2d 17, 19 (Tex.1987)). A trial court may disregard a jury's negative finding and substitute its own affirmative finding only if the evidence conclusively establishes such an affirmative finding as a matter of law. *Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 786 (Tex. App.-Houston [14th Dist.] 2002, no pet.) (citing *Brown v. Bank of Galveston, N.A.*, 930 S.W.2d 140, 145 (Tex.App.-Houston [14th Dist.] 1996, no writ), *aff'd*, 963 S.W.2d 511 (Tex.1998)).

In this case the trial court granted its JNOV on the jury's negative finding-that Rice did not act in good faith and with just cause. Thus, only if Rice conclusively established the affirmative finding as a matter of law-that he proceeded in good faith and with just cause—would a JNOV be proper. In conducting our review, we must decide "whether the evidence at trial would enable reasonable and fair-minded people" to decide the "good faith and just cause" issue as the jury did. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The properly applied scope of the review requires that we "view the evidence in the light favorable to the verdict [not the judgment], crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807.

However, an important limitation on our review is that the determination of the credibility of witnesses is left to the jury. *See id.* at 819; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). The *Keller* Court further explained that "in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review." *City of Keller*, 168 S.W.3d at 821.

### Good Faith and Just Cause

We review the record for evidence establishing, as a matter of law, that Rice proceeded in good faith and with just cause.[1] (1) The jury charge provided the following definitions: (1) " 'Good faith' means an action which is prompted by honesty of intention or a reasonable belief that the action was probably correct[,]" and (2) " '[w]ith just cause' means that the actions of Don Rice in this proceeding were based on reasonable grounds and there was a fair and honest cause or reason for the actions."

### *Rice's Evidence*

In his appellate brief, Rice asserts that the only evidence of good faith and just cause is found in Artie's testimony and Rice's testimony. Under cross-examination by Rice's counsel, Artie conceded that the Will benefited a number of people and that in determining what to do, Rice had every right to consider those people and the benefits they would derive from the Will.

Rice testified that he proceeded in good faith and with just cause. Under direct examination, Rice further explained, as follows, that he was not trying to make money from Frenchie's estate:

Counsel: Now, there's been all kinds of aspersions made that you're in this for the bucks?

Rice: I am not going to take a dollar for it.

Counsel: You're telling the jury that?

Rice: I'm telling the jury that.

Counsel: You're quitting, [resigning as executor and trustee] right, as soon as we can get it straightened out?

Rice: As soon as we can get it straightened out to the satisfaction of the Court.

Counsel: What are you doing here?

Rice: You know, I thought it was the right thing to do. Frenchie asked me to be executor. I thought that it ought to be my duty to be executor of this will and to see that the people in the will, who were given the money, got the money.

Counsel: Is that what you're here for?

Rice: Yes, sir.

Counsel: You're not here for gain?

Rice: I'm not here for gain. I never took any money from Frenchie. I'm not going to start now.

Counsel: So, was Mr. Hunter wrong when he started talking about how much money you were going to get?

Rice: Obviously.

Under direct examination, Rice testified as to his own truthfulness as follows:

Counsel: Do you have any reason to lie about this, Doctor, so you can get a bunch of money? I notice Artie is nodding his head over here?

Rice: No, sir.

Counsel: Are you lying?

Rice: No, sir.

Counsel: Would you lie about this?

Rice: No, sir.

Counsel: They think you are. Are you a liar?

Rice: Not in any way.

Counsel: Is that the kind of reputation you've got?

Rice: Not any way in the world.

Counsel: How do you feel about being called a liar?

---

1. Both in his JNOV motion and on appeal, Rice contends there is no evidence showing that he proceeded in bad faith and without just cause. However, the correct standard is whether the evidence shows as a matter of law that Rice proceeded in good faith and with just cause.

Rice: I don't like it.

Counsel: Look them in the eye and tell them you're not lying.

Rice: I'm not lying to y'all.

The jury was entitled to evaluate Rice's truthfulness in making these disclaimers. In the end, the jury may have concluded that he "doth protest too much." William Shakespeare, *Hamlet* act 3, sc. 2. If Rice did not resign, the Will provided that he would receive significant fees for acting as executor and as trustee of the trusts. Moreover, Rice's testimony that he was not in it for the money is not the only evidence that reasonable jurors could properly consider in assessing whether Rice acted in good faith and with just cause.

### Evidence Supporting the Jury's Verdict

*Relationship Between Artie and Frenchie*

The jury could have questioned whether Rice was truthful about the relationship between Artie and Frenchie. In his deposition, Rice testified that he did not have much personal knowledge of the Longrons' relationship and that all he knew was what he was told. However, at trial, Rice attempted to discredit Artie. Rice testified that: Artie never made a living for himself; Frenchie supported Artie; Artie never did anything with the diesel mechanic training that Frenchie paid for; and Frenchie bought Artie three diesel dump trucks, and "that business didn't go." Rice further testified that Artie "was very sour, very, very, adversarial to his daddy. He and his daddy would get into some really hard fights." When asked if he saw any fights, Rice replied that he "saw a few, not many." Rice further testified that he was not around Artie very much because Artie was not the kind of person Rice enjoyed being around. Thus, at his deposition, Rice gave the impression that he had little personal knowledge about the relationship between Artie and Frenchie. At trial, however, Rice offered definite negative opinions about the relationship between Artie and Frenchie. Reasonable jurors could have considered the differences as inconsistencies that affected Rice's credibility.

Further, Artie presented an alternate view of his failed trucking venture to the jury. He explained that the trucking company initially was profitable but lost business and went into bankruptcy when a larger, better funded company went into competition with the Longrons' company. The Longrons sued the competing company and received settlement proceeds that Frenchie controlled. Thus, the jury may have viewed Rice's testimony as an attempt to blame Artie for events that had reasonable business explanations.

In addition, Macel Stout cast doubt on Rice's testimony regarding Frenchie's relationship with Artie. She testified that in May 2003, Frenchie and Artie had a good relationship. Stout began working for Frenchie at his ranch in the early 1990s and lived at the ranch for approximately nine years. Stout had clerical duties and cooked for Frenchie and his employees. After an argument with Frenchie in 2002, she quit and began working at Walmart. However, in 2003, Frenchie persuaded Stout to return to the ranch. Stout testified that Rice did not spend enough time with Artie to develop a negative view of him.

The jury reasonably could have concluded that Rice's efforts to criticize Artie, and his portrayal of Artie's relationship with Frenchie, were calculated to advance Rice's chances of having the Will admitted to probate. The discrepancies were appropriate for the jury to consider in determining whether Rice pursued his attempt to probate the Will in good faith, and are at

least a scintilla of evidence supporting the jury's verdict.

### Rice's Continued Prosecution of the Probate Application

Artie contends that the "most notable evidence" showing lack of good faith was Rice's continued prosecution of his probate application. Artie maintains that several months before trial, credible witnesses already had established Frenchie's destruction and revocation of the Will.[2]

On July 20, 2004, the parties deposed Frenchie's attorney, Steve Parkhurst. According to Parkhurst, he visited Frenchie shortly before Frenchie's death and told Frenchie that the December 2002 will was still "good." Frenchie asked, "How do I get rid of this thing?" Parkhurst explained that there were only two ways to revoke the will-destroy it or finish the new will and sign it. Parkhurst also testified that he saw the original 2002 will at his last meeting with Frenchie and that the will had parts that were marked-out in red ink. At trial, Parkhurst provided the same testimony.

On May 13, 2004, Stout gave a sworn statement about seeing Frenchie destroy the Will in early November 2003, shortly before he died. Stout gave the same testimony in her July 2004 deposition and at trial.

On August 17, 2004, the parties deposed Sandra Henderson, Frenchie's personal banker. Henderson testified at her deposition that in early November, Frenchie came to the bank and asked her if the bank had a copy of his will. When she replied "no," Frenchie told her not to accept the will from anyone who tried to use it to get money out of his accounts and that he was having a new will prepared She understood that he looked for the will in his safe deposit box because he wanted to destroy it. Henderson gave the same testimony at trial.

Artie's counsel argued in closing that Rice's " 'good faith ended' when the parties took Parkhurst's, Stout's, and Henderson's depositions. Frenchie didn't want that will probated." Artie's counsel contends that all of this evidence made matters "plainly obvious to the jury that [Rice] and his counsel were taking a wild swing at disinheriting [Artie] with a false assurance that [Rice's] counsel would be awarded attorney's fees, even if the application to probate the revoked will failed."

Since the jury rejected the claim that Rice acted in good faith, the standards of appellate review require that we presume the jury accepted the strength and credibility of the witnesses who supported Artie, and that they disbelieved the testimony of the witnesses supporting Rice. As a result, they could conclude that Rice did not make a good faith investigation or evaluation of the circumstances, but instead had personal motives for his continued prosecution of the probate application. The jury could have believed that those motives included either his potential for a pecuniary gain, despite his testimony to the contrary, or that he simply wanted to prevent Artie from inheriting Frenchie's estate.

---

2. Artie does not complain that Rice apparently ignored a legal presumption in Artie's favor. *See In re Estate of Capps*, 154 S.W.3d 242, 245 (Tex.App.-Texarkana 2005, no pet.) (When a will that was last seen in the testator's possession cannot be found after his death, a rebuttable presumption of revocation arises.); *see also In re Estate of Glover*, 744 S.W.2d 197, 199 (Tex.App.-Amarillo 1987), *writ denied*, 744 S.W.2d 939 (Tex.1988) (per curiam). The evidence does not affirmatively show that any witness saw Frenchie's will after he died.

### Conversation with Stout about Destruction of the Will

In assessing Rice's credibility, the jury also may have considered conflicts in Rice's testimony about an alleged telephone conversation he had with Macel Stout. At his deposition, Rice testified that he called Macel Stout at the ranch within the week after the funeral to ask whether she had witnessed the destruction of the Will.[3] According to Rice, Stout then denied seeing the will destroyed. However, Stout testified that she did not talk with Rice on the day of the funeral, that she was not at the ranch on the day of the funeral, and that she never discussed the destruction of the Will with Rice.

In closing, Rice's counsel said the following about Macel Stout and her testimony: "This lady is the pivotal witness in this case. If you believe her, it's all over. You know, we can talk about everything else that happens, but if you believe her, it's all over, Frenchie tore the will up. That's it. It's the end of the story because he destroyed the will." The jury may have believed Macel Stout's testimony not only about Frenchie destroying the will, but also about not having a conversation with Rice about the destruction of the Will. As the fact finder, the jury resolves conflicts in testimony. We presume the jury resolved them in favor of the verdict. *See City of Keller,* 168 S.W.3d at 821. If the jurors believed Stout, they could question whether Rice had adequately investigated the circumstances of the Will's destruction.

Further, they could consider Rice's testimony that he talked to Stout within a week of the funeral, when he did not, as evidence of Rice's motivations to prosecute the case.

### Witness Credibility

"[T]he jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery, Inc.,* 116 at 761. Based on conflicting testimony between Rice and other witnesses and on the inconsistencies in Rice's own testimony (on deposition and at trial) regarding the Longrons' relationship, reasonable jurors could have determined that Rice was not a credible witness. *See id.* If so, the jury also properly could have disregarded his testimony that he neither sought nor would accept financial gain from Frenchie's estate. *See City of Keller,* 168 S.W.3d at 807. The Will provided for Rice to receive various payments in return for his services.[4] Thus, because the jury could reasonably conclude that Rice was not a credible witness, it reasonably could have disregarded his testimony that he acted in good faith and with just cause. Further, the jury could have reasonably concluded that Rice's pecuniary interests motivated him to attempt to probate the Will.

In this case, Rice did not establish, as a matter of law, that he acted in good faith and with just cause as required to receive a JNOV. *See Hubbard,* 76 S.W.3d at 786. Without a jury finding establishing good

---

3. Subsequently, Artie's attorney requested production of the pertinent phone records. At trial, Rice conceded that his phone records did not show that he placed a call to the ranch the week after the funeral. Rather, his phone records showed a one-minute call to the ranch on the day of the funeral. At trial, Rice changed his testimony and stated that he called Stout at the ranch on the day of the funeral.

4. As trustee of the various trusts established in the Will, Rice was to be paid six percent (6%) of the value of the trusts. Further, Rice was to receive any property not otherwise disposed of under any other provision of the Will. In addition, the Will provided that Rice receive compensation for his services as independent executor in the amount "customarily charged for similar services in other estates at the same time the services are rendered."

faith and just cause, Rice was not entitled to the award of attorney's fees and expenses under section 243 of the Probate Code. *See* Tex. Prob.Code Ann. § 243. Accordingly, we sustain Artie's issue.

Having sustained Artie's issue, we reverse the portions of the trial court's judgment that grant a judgment notwithstanding the verdict, and we reverse the trial court's award of attorney's fees and expenses. We render judgment upholding the jury's verdict and render judgment denying Rice's claim for attorney's fees. *See* Tex.R. Civ. P. 324(c); *Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex.1967) (When an appellate court finds the trial court erroneously entered a JNOV, the appellate court "must reverse the judgment of the trial court and enter judgment in harmony with the verdict, unless the appellee presents by cross-points grounds sufficient to vitiate the jury's verdict or to prevent an affirmance of the judgment had one been entered on the verdict."). We affirm the remainder of the trial court's judgment.

AFFIRMED IN PART; REVERSED IN PART AND RENDERED.

DAVID GAULTNEY, Justice, dissenting.

I respectfully dissent. Under section 243 of the Texas Probate Code, an award of reasonable attorney's fees to a person named as an executor in a will is mandatory, whether or not the will is admitted to probate, if the action seeking to probate the will is prosecuted in good faith and with just cause. *See* Tex. Prob.Code Ann. § 243 (Vernon 2003). I agree with the trial court that good faith and just cause are established as a matter of law under the unusual circumstances presented in this case.

Rice was named as the independent executor in the last will Frenchie signed—a will executed less than a year before his death. Frenchie's last will gave Artie one dollar. After Frenchie's death, Artie applied for an independent administration of the estate; he asserted Frenchie died without a will. Artie would then be the sole heir of Frenchie's estate. Rice was the person Frenchie named in his last will to serve as independent executor of his estate. In my view, to not offer the copy of that will for probate under these unusual circumstances would have been a neglect of the responsibility entrusted to him. I would affirm the trial court's judgment.